IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN MANLEY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-14-2749 |
| | § | |
| TEXAS SOUTHERN UNIVERSITY, | § | |
| THURGOOD MARSHALL SCHOOL | § | |
| OF LAW ADMISSIONS COMMITTEE, | § | |
| EDWARD RENEE, *et al.* | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND OPINION

### I.    Background

Between 2008 and 2014, Stephen Manley, an African-American male, repeatedly applied for admission from the Thurgood Marshall School of Law at Texas Southern University, historically black institutions. Each of Manley's applications was denied. Manley, proceeding *pro se* and *in forma pauperis*, sued the law school, its admissions committee and dean of admissions, and Texas Southern University. He alleged that Thurgood Marshall's policies on admissions and recruiting discriminated against him on the basis of his race, sex, and disability. Manley alleged that the role of an applicant's undergraduate grade point average and Law School Admissions Test scores made the admissions and recruiting policies discriminatory. Manley sought damages and injunctive relief, including a court order admitting him to the law school.

The defendants moved to dismiss. (Docket Entry No. 14). After hearing oral argument, (Docket Entry No. 19), the court dismissed Manley's claims under the Equal Education Opportunities Act, the Americans with Disabilities Act, and the Rehabilitation Act, with prejudice

and without leave to amend, because amendment would be futile.  The court dismissed the remaining claims, without prejudice and with leave to amend.  (Docket Entry No. 20).

Manley filed an amended complaint, alleging 16 overlapping causes of action and attaching more than 200 pages of exhibits.  The amended complaint, liberally construed, alleges that the law school's admissions and recruiting policies violate: (1) 42 U.S.C. §§ 1981 and 1983; (2) the Texas Education Code § 51.842; (3) the Equal Protection Clause of the Fourteenth Amendment; (4) Titles VI and IX of the Civil Rights Act, 42 U.S.C. § 2000d, 20 U.S.C. § 1681, *et seq.*; (5) the Privileges and Immunities Clause of the Fourteenth Amendment; (6) the Full Faith and Credit Clause; and (7) the Interstate Commerce Clause.  Manley seeks $800,000 in damages, an injunction requiring the law school to "use a[n] alternative to the LSAT that is less discriminatory in it[s] effects upon minority groups," and an injunction requiring the law school to admit Manley.  (Docket Entry No. 21, ¶ 26).

The defendants have moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  They argue that the Eleventh Amendment bars Manley's suit against Texas Southern and Thurgood Marshall, and that his claims otherwise fail as a matter of law.  (Docket Entry No. 23). Manley did not respond.[1]

The parties' arguments are analyzed under the applicable law.

---

[1] Manley moved to expedite consideration of Texas Southern's motion, (Docket Entry No. 25), and Texas Southern responded.  (Docket Entry No. 27).  Texas Southern moved to withdraw its response and replace it with a properly captioned one.  (Docket Entry No. 28).  Texas Southern also moved to stay discovery.  (Docket Entry No. 31).  Manley opposes both motions.  The court grants the motion to withdraw and replace the response.  Because the court grants Texas Southern's motion to dismiss, the motions to expedite and to stay are moot.

## II.     The Applicable Legal Standards

### A.     The Motion to Dismiss Under Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) governs challenges to a court's subject-matter jurisdiction.  "Under Rule 12(b)(1), a claim is properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the claim."  *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012) (quotation omitted).  Rule 12(b)(1) challenges to subject-matter jurisdiction may be facial or factual attacks.  *See, e.g.*, *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 440 (6th Cir. 2012); *Russell v. City of Houston*, 808 F. Supp. 2d 969, 972 (S.D. Tex. 2011) (citing *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981)).

"A facial attack happens when a defendant files a Rule 12(b)(1) motion without accompanying evidence."  *Jackson v. Texas Southern Univ.*, 997 F. Supp. 2d 613, 620 (S.D. Tex. 2014) (citing *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981)).  "In a facial attack, allegations in the complaint are taken as true."  *Id.* (citing *Saraw Partnership v. United States*, 67 F.3d 567, 569 (5th Cir. 1995)).  "A defendant makes a factual attack upon a complaint when a defendant 'submits affidavits, testimony, or other evidentiary materials.'"  *Gloston v. Dep't of Homeland Sec.*, 2014 WL 1660630, at *1 (E.D. La. Apr. 25, 2014) (quoting *Paterson*, 644 F.2d at 523).  "If a court confronts a factual attack, the plaintiff must 'submit facts through some evidentiary method and has the burden of proving by a preponderance of the evidence that the trial court does have subject matter jurisdiction.'"  *Id.* (quoting *Paterson*, 644 F.2d at 523).

### B.     The Motion to Dismiss Under Rule 12(b)(6)

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires

"a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).

To withstand a Rule 12(b)(6) motion, a "complaint must allege 'more than labels and conclusions,'" and "'a formulaic recitation of the elements of a cause of action will not do.'" *Norris v. Hearst Trust*, 500 F.3d 454, 464 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief — including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (footnote omitted) (quoting *Twombly*, 550 U.S. at 555). "Conversely, 'when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" *Id.* (quoting *Twombly*, 550 U.S. at 558).

4

"[I]n deciding a motion to dismiss for failure to state a claim, courts must limit their inquiry to the facts stated in the complaint and the documents either attached to or incorporated in the complaint . . . courts may also consider matters of which they may take judicial notice." *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996).  A court may, however, "consider documents integral to and explicitly relied on in the complaint, that the defendant appends to his motion to dismiss, as well as the full text of documents that are partially quoted or referred to in the complaint."  *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 882 (S.D. Tex. 2001) (internal quotation marks omitted). The court may consider such extrinsic materials as matters of public record without converting the motion into one seeking summary judgment.

When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff a chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice, unless it is clear that to do so would be futile.  *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal.").  However, a plaintiff should be denied leave to amend a complaint if the court determines that "the proposed change clearly is frivolous or advances a claim or defense that is legally insufficient on its face." 6 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1487 (2d ed. 1990); *see also Ayers v. Johnson*, 247 F. App'x 534, 535 (5th Cir. 2007) ("'[A] district court acts within its discretion when dismissing a motion to amend that is frivolous or futile.'" (quoting *Martin's Herend Imps, Inc. v. Diamond & Gem Trading U.S. of Am. Co.*, 195 F.3d 765, 771 (5th Cir. 1999))). *Manor Assocs. v. City of Houston*, 816 F. Supp. 2d 394, 404 n.5 (S.D. Tex. 2011).

5

Under Federal Rule of Civil Procedure 15(a), a district court "should freely give leave [to amend] when justice so requires." FED. R. CIV. P. 15(a)(2). "[T]he language of this rule evinces a bias in favor of granting leave to amend." *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 994 (5th Cir. 2005) (internal quotation marks omitted). Although leave to amend should not be automatically granted, "[a] district court must possess a substantial reason to deny a request for leave to amend[.]" *Id.* (internal quotation marks omitted). Under Rule 15(a), "[d]enial of leave to amend may be warranted for undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies, undue prejudice to the opposing party, or futility of a proposed amendment." *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 270 (5th Cir. 2010). A proposed amendment is futile if "the amended complaint would fail to state a claim upon which relief could be granted." *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 873 (5th Cir. 2000). "[T]he same standard of legal sufficiency as applies under Rule 12(b)(6)" applies to determining futility. *Id.* (internal quotation marks omitted).

## III.   Analysis

### A.   Dismissal for Lack of Subject-Matter Jurisdiction

Texas Southern and Thurgood Marshall argue that this court lacks subject-matter jurisdiction over Manley's § 1981, § 1983, and Texas Education Code claims under Eleventh Amendment immunity. (Docket Entry No. 23, at 8-9).

"Absent waiver, neither a State nor agencies acting under its control may 'be subject to suit in federal court.'" *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993) (quoting *Welch v. Tex. Dep't of Highways & Pub. Transp.*, 483 U.S. 468, 480 (1987) (plurality opinion)); *see Edelman v. Jordan*, 415 U.S. 651, 663 (1974). Texas Southern University and the Thurgood Marshall School of Law are Texas state agencies. *See* TEX. EDU. CODE § 61.003(3)

6

(including Texas Southern University in the definition of "[g]eneral academic teaching institution"); Tex. Gov. Code § 572.002(10)(B) (defining "State agency" as "a university system or an institution of higher education as defined by Section 61.003, Education Code, other than a public junior college"); *Lewis v. Univ. of Texas Med. Branch at Galveston*, 665 F.3d 625, 630 (5th Cir. 2011); *Jackson*, 997 F. Supp. 2d at 623 ("Under Texas law, state universities, including Texas Southern University, are agencies of the State and enjoy sovereign immunity." (quotations omitted)).

Manley does not argue that Texas has consented to suit. "Texas has not waived sovereign immunity for § 1983 monetary claims against TSU or its employees in their official capacities." *Jackson*, 997 F. Supp. 2d at 624 (citing *Dittmer v. Texas Southern Univ.*, Civ. A. No. 10–182, 2010 WL 3119925, at *4 (S.D. Tex. Aug. 5, 2010)). "Nor has Congress expressly waived sovereign immunity for § 1983 suits," *Lewis*, 665 F.3d at 630, or "claims under § 1981," *Jackson*, 997 F. Supp. 2d at 625.

Manley's claims for damages under §§ 1981 and 1983, and § 51.842 of the Texas Education Code against Texas Southern University, the Thurgood Marshall School of Law, and its admissions committee and its dean of admissions, are barred by the Eleventh Amendment and dismissed. *See Neinast v. Texas*, 217 F.3d 275, 280 (5th Cir. 2000) ("The Eleventh Amendment secures the states' immunity from private suits for monetary damages filed in federal court."); *see also Buckhannon Bd. and Care Home, Inc. v. W. Va. Dep't of Health and Human Res.*, 532 U.S. 598, 609 n.10 (2001) (recognizing that "States and state officers acting in their official capacity are immune from suits for damages"). Manley's claims under these statutes for injunctive relief against Texas Southern and the Thurgood Marshall School of Law are also foreclosed by state-sovereign immunity. *See Puerto Rico Aqueduct*, 506 U.S. at 146 ("The doctrine of *Ex parte Young*, which ensures that state officials do not employ the Eleventh Amendment as a means of avoiding compliance with federal

law, . . . has no application in suits against the States and their agencies, which are barred regardless of the relief sought." (citations omitted)).

There is a narrow exception to Eleventh Amendment immunity for suits brought against individuals in their official capacity, as agents of the state or a state entity, if the relief sought is injunctive in nature and prospective in effect. *See Aguilar v. Texas Dept. of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998) (citing *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1980)). Manley's claims under these statutes against the law school's admissions committee and Edward Renee, its dean of admissions, are not barred to the extent that he seeks prospective injunctive relief.

Texas Southern University argues that these claims fail because it is the "only Defendant in this lawsuit." (Docket Entry No. 23). But Manley's amended complaint names both the law school's admissions committee and Edward Renee and identifies as parties the law school's "admission council, board of directors, admissions decision makers, as well as its admission committee." (Docket Entry No. 21, at 1-2). Mr. Renee has moved in his official capacity, along with the other defendants, to stay discovery. (*See* Docket Entry No. 31, at 1). Construing Manley's *pro se* pleadings liberally, the court has subject-matter jurisdiction to consider Manley's claim for prospective injunctive relief against Renee under §§ 1981 and 1983, and § 51.842 of the Texas Education Code.

**B.     Dismissal for Failure to State a Claim**

      **1.     The Claims under Sections 1981 and 1983 for Violations of the Equal Protection Clause**

Texas Southern argues that Manley's amended complaint fails to state a claim for equal protection violations under §§ 1981 and 1983.

Section 1981 states that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).  To state a § 1981 claim, a plaintiff must allege facts showing that he or she was the subject of intentional discrimination.  *See Coleman v. Houston Independent School Dist.*, 113 F.3d 528, 533 (5th Cir. 1997) ("[A] cause of action for racial discrimination in the making and enforcement of contracts, under § 1981, requires the plaintiff to demonstrate intentional discrimination.").  A claim that a policy disproportionately impacts a protected class is not actionable under § 1981.  *See National Ass'n of Government Employees v. City Public Service Bd.*, 40 F.3d 698, 715 (5th Cir. 1994) (citing *Washington v. Davis*, 426 U.S. 229, 238–240 (1976)).  "Plaintiffs are required . . . under section 1981, to demonstrate intentional discrimination; mere disparate impact will not suffice."  *Id.*

Similarly, "[t]o state a claim of racial discrimination under the Equal Protection Clause and section 1983, the plaintiff 'must allege and prove that he received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent.'"  *Priester v. Lowndes Cnty.*, 354 F.3d 414, 424 (5th Cir. 2004) (quoting *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001)).  "A discriminatory purpose 'implies that the decision maker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effect on an identifiable group.'"  *Id.* (quoting *Taylor*, 257, F.3d at 473).

9

Manley's amended complaint alleges that the law school's admissions committee "utilizes the LSAT to exclude otherwise qualified prospective law school applicants" because although the LSAT "seem[s] race neutral on its face," it "in fact has a historical discriminatory effect against minority students" seeking admission to a law school.  (Docket Entry No. 21, at 3).  Manley alleges that the Thurgood Marshall School of Law "admission's [sic] policy appears race neutral upon its face but in effect(s) the policy practices when methodically applied to minority applicants discriminatorily shrinks the qualified minority applicant pools."  (Docket Entry No. 21, at 7).  He alleges that the school's "use of the LSAT and/or the ABA standards" have a "disproportionate adverse discriminatory impact upon otherwise qualified applicant[s] like Stephen Manley."  (Docket Entry No. 21, at 8).

Manley's amended complaint alleges only disparate impact, not disparate treatment.  (*See id.*, at 9 ("The LSAT has historically and statistically barred numerous minorities from gaining equal access to law school as well as obtaining a legal education.")).  That claim is not actionable under § 1981, § 1983, or the Equal Protection Clause.  *See Clyburn v. Shields*, 33 F. App'x 552, 555-56 (2d Cir. 2002) (rejecting plaintiffs' race-based discrimination challenges to the University of Buffalo School of Law's "reliance on the LSAT as an admissions criterion" because they did not adequately allege intentional discrimination as required by the Equal Protection Clause and 42 U.S.C. § 1981); *see also Priester*, 354 F.3d at 424.

Manley cites *United States v. Fordice*, 505 U.S. 717 (1992), which held that a state with a previously segregated educational system could be liable for continuing equal protection violations "even though the State has abolished the legal requirement that whites and blacks be educated separately and has established racially neutral policies not animated by a discriminatory purpose." *Id.* at 731.  In *Fordice*, the Court considered admissions policies of Mississippi's "three flagship

historically white universities." *Id.* at 733-34.  Beginning in 1963, these universities had required

"all entrants to achieve a minimum composite score of 15 on the test administered by the American

College Testing Program (ACT)." *Id.* at 734.  When Mississippi adopted the admissions policy, "the

average ACT score for white students was 18 and the average score for blacks was 7."  *Id.*

Mississippi eventually altered its admissions standards, as follows:

> Every Mississippi resident under 21 seeking admission to the
> university system must take the ACT test.  Any applicant who scores
> at least 15 qualifies for automatic admission to any of the five
> historically white institutions except Mississippi University for
> Women, which requires a score of 18 for automatic admission unless
> the student has a 3.0 high school grade average.  Those scoring less
> than 15 but at least 13 automatically qualify to enter Jackson State
> University, Alcorn State University, and Mississippi Valley State
> University.

*Id.* at 734-35.  The Supreme Court held that:

> [w]ithout doubt, these requirements restrict the range of choices of
> entering students as to which institution they may attend in a way that
> perpetuates segregation.  Those scoring 13 or 14, with some
> exceptions, are excluded from the five historically white universities
> and if they want a higher education must go to one of the historically
> black institutions or attend junior college with the hope of
> transferring to a historically white institution.

*Id.*; *see also id.* at 736 ("Another constitutionally problematic aspect of the State's use of the ACT

test scores is its policy of denying automatic admission if an applicant fails to earn the minimum

ACT score specified for the particular institution, without also resorting to the applicant's high

school grades as an additional factor in predicting college performance.").

   The Court ruled that these "present admissions standards [were] not only traceable to the *de*

*jure* system and were originally adopted for a discriminatory purpose, but they also [had] present

discriminatory effects" because "[i]n 1985, 72 percent of Mississippi's white high school seniors

achieved an ACT composite score of 15 or better, while less than 30 percent of black high school

seniors earned that score." *Id.* at 735.  The *Fordice* Court concluded that Mississippi had not "met its affirmative duty to dismantle its prior dual university system" and could not "discharge its constitutional obligations until it eradicate[d] policies and practices traceable to its prior *de jure* dual system that continue to foster segregation." *Id.* at 728.

After *Fordice*, "[i]f policies traceable to the *de jure* system are still in force and have discriminatory effects, those policies too must be reformed to the extent practicable and consistent with sound educational practices." *Id.* at 730.  The Fifth Circuit has "read *Fordice* to require that 'each suspect state policy or practice be analyzed to determine whether it is traceable to the prior *de jure* system, whether it continues to foster segregation, whether it lacks sound educational justification, and whether its elimination is practicable.'" *Ayers v. Fordice*, 111 F.3d 1183, 1192 (5th Cir. 1997) (quoting *United States v. Louisiana*, 9 F.3d 1159, 1164 (5th Cir. 1993)).

Here, unlike the historically white universities described in *Fordice*, Texas Southern University and the Thurgood Marshall School of Law are historically black institutions.  Manley does not allege facts that, if proven, would support an inference that the law school's reliance on the LSAT and GPA in its admissions decisions was "traceable to the *de jure* system and [was] originally adopted for a discriminatory purpose." *See id.* at 734; *see also GI Forum v. Texas Educ.*, 1999 WL 33290624, at *4 (W.D. Tex. July 27, 1999) (rejecting plaintiffs' § 1983 and Title VI challenge to the Texas Assessment of Academic Skills (TAAS) test because even though the plaintiffs "demonstrated that a history of discrimination exists in the State, they have not shown that the TAAS test itself is rooted in that history" (citing *Fordice*)); *Richards v. League of United Latin Am. Citizens (LULAC)*, 868 S.W.2d 306, 315 (Tex. 1993) (rejecting the plaintiffs' challenge to the State's "allocation of resources in undergraduate, graduate, and professional programs to the border area schools" because "[a]lthough Texas formerly operated a higher education system in which

12

black students were segregated by law," the "plaintiffs have not shown that the policies and practices attacked in this suit—i.e., the placement of institutions in regions other than the border area and the allocation of resources to nonborder area schools—are in any way traceable to that *de jure* system of segregation").

The admissions and recruiting policies Manley challenges are not rooted in the State's prior dual system.[2] "[I]f challenged policies are not rooted in the prior dual system, the question becomes whether the fact of racial separation establishes a new violation of the Fourteenth Amendment under traditional principles." *Fordice*, 505 U.S. at 732 n.6. *Fordice* held that "for present policies that do not have such historical antecedents, a claim of violation of the Fourteenth Amendment cannot be made out without a showing of discriminatory purpose." 505 U.S. at 732 n.8. Manley alleges that the school uses "the LSAT as a tool of discrimination in its admission and selection processes" and that it "maintains an intentional and discriminatory" policy. (Docket Entry No. 21, at 8, 14). But he fails to allege facts that, if proven, would support finding that the law school's admissions officers rely on the LSAT for the purpose of discriminating against individuals of Manley's race, sex, and disability status. His amended complaint does not allege a plausible claim of discriminating intent necessary for claims under §§ 1981, 1983, and the Equal Protection Clause. *See Clyburn v. Shields*, 33 F. App'x 552, 555-56 (2d Cir. 2002) (rejecting the plaintiffs' race-based discrimination

---

[2] Even if the policies were traceable to *de jure* segregation, it is unclear how Thurgood Marshall's reliance on a test that Manley alleges disproportionately harms African-Americans perpetuates, rather than dismantles, the state's prior dual system. *Cf. Fordice*, 505 U.S. at 743 (rejecting petitioners' request "to order the upgrading of Jackson State, Alcorn State, and Mississippi Valley State *solely* so that they may be publicly financed, exclusively black enclaves by private choice" because "[t]he State provides these facilities for all its citizens and it has not met its burden under Brown to take affirmative steps to dismantle its prior de jure system when it perpetuates a separate, but 'more equal' one"); *United States v. Louisiana*, 815 F. Supp. 947, 949 (E.D. La. 1993) ("*Fordice* 'portends neither the destruction of historically black colleges nor the severing of those institutions from their distinctive histories and traditions.'" (quoting *Fordice*, 505 U.S. at 745 (Thomas, J., concurring)); *Walker v. U.S. Dep't of Housing and Urban Development*, 326 F. Supp. 2d 780, 786 (N.D. Tex. 2004) (rejecting the plaintiffs' reliance on *Fordice* in a public-housing challenge because "[t]he prior race-conscious criteria . . . was never shown to have segregative effects").

challenges to the University of Buffalo School of Law's "reliance on the LSAT as an admissions criterion" because they failed to adequately allege intentional discrimination as required by the Equal Protection Clause and 42 U.S.C. § 1981); *Landor v. Soc'y of the Roman Catholic Church of the Diocese of Lafayette*, 2014 WL 4630692, at *9, *11 (W.D. La. July 14, 2014) (dismissing the plaintiff's § 1981 and Equal Protection claims because their "pleadings [did] not show racial animus on the part of the defendants regarding any contractual decisions" or "purposeful or intentional discrimination").

These claims are dismissed with prejudice, because further amendment would be futile.

### 2.    The Texas Education Code § 51.842(b) Claim

Section 51.842(b) provides that "[a]n applicant's performance on a standardized test may not be used in the admissions or competitive scholarship process for a graduate or professional program as the sole criterion for consideration of the applicant or as the primary criterion to end consideration of the applicant." TEX. EDU. CODE § 51.842(b). "If an applicant's performance on a standardized test is used in the admissions [process]. . . , the applicant's performance must also be used to compare the applicant's test score with those of other applicants from similar socioeconomic backgrounds to the extent that those backgrounds can be properly determined and identified by the general academic teaching institution . . . based on information provided in the institution's . . . admissions . . . process." *Id.* Manley's amended complaint appears to allege that the Thurgood Marshall School of Law and Texas Southern University violated this provision by relying solely or heavily on his LSAT performance. But Manley does not cite, and this court has not found, authority allowing a plaintiff to bring a private cause of action for an alleged violation of § 51.842(b). This claim is dismissed with prejudice, because further amendment would be futile.

### 3.    The Title VI Claims

14

Title VI of the Civil Rights Act of 1964 states that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. "[O]nly public and private entities can be held liable under Title VI." *Price ex rel. Price v. La. Dep't of Ed.*, 329 F. App'x 559, 561 (5th Cir. 2009) (per curiam) (citing *Shotz v. City of Plantation*, 344 F.3d 1161, 1171 (11th Cir. 2003)); *United States v. Baylor Univ. Med. Ctr.*, 736 F.2d 1039, 1044 n.9 (5th Cir. 1984)); *accord Whitfield v. Notre Dame Middle Sch.*, 412 F. App'x 517, 521 (3d Cir. 2011); *Buchanan v. City of Bolivar, Tenn.*, 99 F.3d 1352, 1356 (6th Cir. 1996).

To state a claim for Title VI discrimination, a plaintiff must, among other things, "plead facts in support of *intentional* discrimination." *Price*, 329 F. App'x at 561 (citing *Alexander v. Sandoval*, 532 U.S. 275, 281 (2001)) (emphasis added); *accord, e.g.*, *Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist.*, No. 10-4478, 2011 WL 3737443, at *5 (3d Cir. Aug. 25, 2011) (citing *Alexander v. Choate*, 469 U.S. 287, 293–94 (1985)); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1202 (11th Cir. 1999). A complaint that fails to "provide specific allegations of acts that were taken with discriminatory intent" does not state a claim for Title VI discrimination. *Muthukumar v. Univ. of Tex. at Dallas*, No. 3:10-CV-0115-B, 2010 WL 5287530, at *5 (N.D. Tex. Dec. 27, 2010); *see also Goonewardena*, 475 F. Supp. 2d at 328–29.

In his amended complaint, Manley alleges that the Thurgood Marshall School of Law discriminated against him by denying him admission based on his low LSAT and GPA scores. (Docket Entry No. 21, at 9). As discussed above, he alleges disparate impact, not disparate

15

treatment, and disparate impact allegations cannot sustain a Title VI claim.[3]  *See Clyburn*, 33 F.

App'x at 555 (rejecting law school applicants' "disparate impact discrimination" claim under Title

VI because "no private cause of action exists to enforce disparate impact regulations promulgated

to Title VI").  Manley cites *Fordice*, but that case is no more helpful to Manley's Title VI claims

than to his Fourteenth Amendment claims.  *See Ayers v. Thompson*, 358 F.3d 356, 360 n.4 (5th Cir.

2004) (observing that the Supreme Court "obviat[ed] the need to engage in distinct analyses" of

claims under Title VI and the Fourteenth Amendment because "'the reach of Title VI's protection

extends no further than the Fourteenth Amendment.'" (quoting *Fordice*, 505 U.S. at 732 n.7)).

In any event, Manley has not pleaded specific facts that, if proven, allow a plausible

inference that the law school's reliance on GPAs and LSAT scores in its admissions decisions was

motivated by discriminatory intent.  Manley has failed to state a Title VI discrimination claim.  *See*

*Easley*, 984 F. Supp. 2d at 637 (dismissing MBA student's Title VI claim based on allegations that

he received low grades based in part on his national origin because "[t]he court c[ould] locate no

facts in the complaint, and [the] plaintiff ha[d] directed the court to none, that would allow even an

inference that national origin played a role in any decision or action by [the defendant faculty

members]").

This claim is dismissed with prejudice, because further amendment would be futile.

### 4.      The Title IX Claims

Manley alleges that the Thurgood Marshall School of Law's reliance on the LSAT in its

admissions and recruitment policies violates Title IX and its implementing regulations.  (Docket

---

[3] Manley cites *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977 (1988), in support of his disparate impact argument.  But that case addressed whether courts may apply a disparate impact analysis to claims of discrimination in discretionary promotion practices under Title VII, not educational access cases like Manley's brought under Title VI.  *Compare* 42 U.S.C. § 2000d, *with id.* § 2000e-2.

Entry No. 21, at 19).  Title IX states that, subject to exceptions not applicable here,[4] "[n]o person

. . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be

subjected to discrimination under any education program or activity receiving Federal financial

assistance." 20 U.S.C. § 1681(a).  An implementing regulation states that a federal funding recipient

"shall not discriminate on the basis of sex in the recruitment and admission of students."  34 C.F.R.

§ 106.23(a).  A claim under Title IX requires a plaintiff to allege that the defendant (1) received

federal financial assistance, and (2) excluded the plaintiff from participating in the defendant's

educational programs because of the plaintiff's sex.  *See Easley v. Univ. of Texas at Arlington*, 984

F. Supp. 2d 631, 635-36 (N.D. Tex. 2013) (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 680

(1979)).

Manley alleges that the LSAT has "discriminatory effects and/or an adverse impacts upon

minority male applicants and discriminates upon the basis of sex."  (Docket Entry No. 21, at 18).

He also alleges that the Thurgood Marshall School of Law's "recruitment policy has the effects of

discriminating on African America[n] male applicants."  (Docket Entry No. 21, at 19).  Manley

alleges disparate impact, not intentional discrimination.  Manley cites no authority for the

---

[4] Under 20 U.S.C. § 1681(b):

> Nothing contained in subsection (a) of this section shall be interpreted to
> require any educational institution to grant preferential or disparate
> treatment to the members of one sex on account of an imbalance which may
> exist with respect to the total number or percentage of persons of that sex
> participating in or receiving the benefits of any federally supported program
> or activity, in comparison with the total number or percentage of persons of
> that sex in any community, State, section, or other area.

20 U.S.C. § 1681(b).  The statute contains only one exception: "[T]his subsection shall not be construed to
prevent the consideration in any hearing or proceeding under this chapter of statistical evidence tending to
show that such an imbalance exists with respect to the participation in, or receipt of the benefits of, any such
program or activity by the members of one sex."  *Id.*

proposition that a disparate impact claim may be brought under Title IX and does not address case law to the contrary.

In *Alexander v. Sandoval*, 532 U.S. 275 (2001), the plaintiff claimed that Alabama's English-only driving exam had a disparate impact on non-English speaking test takers and sued under Title VI. The Supreme Court concluded that Title VI, 42 U.S.C. § 2000d, on which Title IX is patterned, prohibits only intentional discrimination. *Id.* at 280–81. Although Title VI's promulgating regulations prohibit conduct that has a disparate impact, 28 C.F.R. § 42.104(b)(2), the Court held that the statute had no "rights-creating language" and did not permit a private remedy. 532 U.S. at 288–93. The Court concluded that the plaintiff had no private cause of action under Title VI, emphasizing that Title IX "'was patterned after Title VI'" and contains "'parallel language.'" *Id.* at 280 (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 694 (1979)); 279.293.

Cases have interpreted *Sandoval* as: (1) requiring intentional discrimination for a claim under Title IX, 20 U.S.C. § 1681, which is virtually identical to § 2000d; and (2) precluding a private right of action based on regulations promulgated under 20 U.S.C. § 1682, which is virtually identical to § 2000d-1. *See, e.g.*, *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 946 (D.C. Cir. 2004) (observing that *Sandoval* precludes a disparate impact claim under Title IX).

The Fifth Circuit has not squarely considered a disparate impact claim under Title IX since *Sandoval*, but the Circuit's prior holdings are consistent with that case. In *Fort v. Dallas Indep. Sch. Dist.*, 82 F.3d 414, 1996 WL 167072, at *3 & n.3 (5th Cir. Mar. 11, 1996) (unpublished), the court held that "to establish a claim under Title IX, the plaintiff must establish that an educational institution receiving federal assistance intentionally discriminated on the basis of the plaintiff's sex." (citing *Chance v. Rice Univ.*, 984 F.2d 151, 153 (5th Cir. 1993)). The court noted that discriminatory intent requires a plaintiff to meet a higher burden of proof than disparate impact. *Id.*

*3 n.3; *see also McCully v. Stephenville Ind. Sch. Dist.*, 2014 WL 4060255, at *5 (N.D. Tex. Aug. 14, 2014) (citing *Fort* with approval and concluding that "no rational finder of fact would find that SISD has intended in its athletic program to treat its female students differently from its male students"). In *Kamps v. Baylor University*, 592 F. App'x 282, 285-86 (5th Cir. 2014), the Fifth Circuit applied *Sandoval*'s reasoning to hold that the ADA, which has language similar to Title VI and Title IX, does not allow a disparate impact claim. *See id.* (observing that "the ADA's prohibition [against discrimination on the basis of age] is almost identical to Title VI of the Civil Rights Act, which prohibits only intentional discrimination" on the basis of race).

Manley conclusorily alleges that the Thurgood Marshall School of Law "predominantly recruit[s] women to meet goals or seating goals at the exclusion of [A]frican [A]merican male[] applicants who are not equally protected but are admitted into [the school] using the LSAT race, sex and gender as tools of discrimination." (Docket Entry No. 21, at 19). But Manley's amended complaint does not allege any specific facts that, if proven, would support an inference that the law school's reliance on the LSAT or its recruitment policies stemmed from discriminatory intent. He also alleges that the school's policies "arbitrarily barred" him from gaining admission, but he does not allege an intent to discriminate because of an animus toward black males. (Docket Entry No. 21, at 20). There is no basis for a disparate impact claim under Title IX. *See Easley*, 984 F. Supp. 2d at 637 (dismissing a male MBA student's Title IX claim based on allegations that he received low grades in part due to his sex because "[t]he complaint allege[d] nothing as would show that [the] defendant intentionally treated plaintiff differently than any female student under the same circumstances"); *Clyburn*, 33 F. App'x at 555-56 (rejecting the "plaintiffs' allegations that their [law school] applications were rejected because of their age and gender" as "wholly conclusory" because they did "not allege any factual basis . . . other than that they are forty-year-old males who were

denied admission to the law school"); *see also Kamps*, 592 F. App'x at 285 (rejecting law school applicants' ADA claims in part because "knowing that GPA disadvantages older applicants does not mean Baylor used GPA *in order to* disadvantage older applicants" (emphasis in original)).

This claim is dismissed with prejudice, because further amendment would be futile.

### 5.        The Privileges and Immunities Claim

Manley alleges that the Thurgood Marshall School of Law's admissions policies and practices violate the Privileges and Immunities Clause.  He alleges that he was "denied access to a legal education and denied an equal educational opportunity to a legal education solely and primarily due to" his "performance on the LSAT."  (Docket Entry No. 21, at 10).  Although Manley cites a Privileges and Immunities Clause under the Fourteenth Amendment to the United States Constitution, not under Article IV, § 2, but the court analyzes his allegations under both.  (*See generally* Docket Entry No. 21).

### a.        The Article IV, § 2, Privileges and Immunities Clause

The Privileges and Immunities Clause of Article IV, § 2 states that "[t]he citizens of each state shall be entitled to all Privileges and Immunities of Citizens in the several states." U.S. CONST. ART. IV, § 2.  This clause "merely limits the right of states to exclude citizens of other states from privileges granted to its own citizens." *Cramer v. Skinner*, 931 F.2d 1020, 1030 n.7 (5th Cir. 1991). Its "sole purpose" is to "declare to the several States, that whatever those rights, as you grant or establish them to your own citizens, or as you limit or qualify, or impose restrictions on their exercise, the same, neither more nor less, shall be the measure of the rights of citizens of other States within your jurisdiction." *Merrifield v. Lockyer*, 547 F.3d 978, 983 n.7 (9th Cir. 2008) (quoting *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 77 (1872)).

20

The Supreme Court has held that "the opportunity to practice law" is a "fundamental right" protected by the Privileges and Immunities Clause of Article IV, § 2, of the U.S. Constitution. *See Supreme Court of New Hampshire v. Piper*, 470 U.S. 274, 281 (1985). The plaintiff in *Piper* was admitted to practice in Vermont. She wanted to practice in the neighboring State of New Hampshire, but that State's bar-admissions rule excluded nonresidents. *See id.* at 276-77. Piper sued the New Hampshire State Supreme Court, alleging that the admissions rule violated the Privileges and Immunities Clause of Article IV, § 2. *See id.* The United States Supreme Court agreed, holding that the "nonresident's interest in practicing law is a 'privilege' protected by the Clause" and the State's discrimination against nonresidents was neither supported by or closely related to "substantial" reasons. *See id.* at 288.

In this case, unlike *Piper*, Manley seeks admission to a public law school, not to the state bar. Unlike the plaintiff in *Piper*, Manley is a resident of the State where he wants to go to law school. He does not allege that the Thurgood Marshall School of Law admissions policy treats out-of-state applicants differently than in-state applicants. Manley points to a letter from the State Bar of California confirming his registration and argues that Thurgood Marshall's refusal to admit him or accept his credits from non-ABA accredited law schools outside Texas violates the Privileges and Immunities Clause. (Docket Entry No. 21-8, at 2). Manley does not allege that he is a member of the California State Bar. In any event, Manley has not alleged how Thurgood Marshall's credit-transfer policies treat out-of-state transfer applicants differently from applicants who have attended law schools in Texas. *See Whittle v. United States*, 7 F.3d 1259, 1262 (6th Cir. 1993) (holding that the "Privileges and Immunities Clause simply d[id] not apply" to a plaintiff's claim because "[l]awyers from other states who, like [the plaintiff], graduated from schools not accredited by the ABA, also would be disqualified from consideration"); *Schumacher v. Nix*, 965 F.2d 1262, 1265 n.4

(3d Cir. 1992) (holding that the "plaintiffs' privileges and immunities claim lacks merit, because plaintiffs are required to meet the same requirements for admission to the Pennsylvania bar under the Rule as Pennsylvania graduates of unaccredited law schools"); *Nat'l Ass'n for Advancement of Multijurisdiction Practice v. Berch*, 973 F. Supp. 2d 1082, 1110 (D. Ariz. 2013) (rejecting a plaintiff's challenge to Arizona's reciprocal-admissions rule under the Privileges and Immunities Clause of Article IV, § 2, because the "rule applies equally to Arizona residents and non-residents who seek admission to the Arizona Bar on motion"); *cf. Clyburn*, 33 F. App'x at 556 ("reject[ing] as frivolous the plaintiffs' contention that the Equal Protection Clause requires that in-state minority residents be given [law school] admissions preference over out-of-state residents").

To the extent that Manley relies on the Privileges and Immunities Clause of Article IV of the U.S. Constitution, he fails to state a claim.

### b.    The Fourteenth Amendment Privileges and Immunities Clause

The Privileges or Immunities Clause of the Fourteenth Amendment states: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." U.S. CONST. amend. IX, § 1. The clause "includes those rights and privileges which, under the laws and Constitution of the United States, are incident to citizenship of the United States, but does not include rights pertaining to state citizenship and derived solely from the relationship of the citizen and his state established by state law." *Snowden v. Hughes*, 321 U.S. 1, 6–7 (1943) (citing *In re Slaughter-House Cases*, 16 Wall. 36, 74, 79 (1872)). "The courts and legal commentators have interpreted the [*Slaughter-House Cases*] as rendering the Clause essentially nugatory." *Paciulan v. George*, 229 F.3d 1226, 1229 (9th Cir. 2000). In *Saenz v. Roe*, 526 U.S. 489 (1999), the Supreme Court revived the Clause in the right-to-travel context to hold that travelers deciding to

become permanent residents of a new state enjoy "the right to be treated like other citizens of that State." *Id.* at 500-07.

Manley has not alleged that Thurgood Marshall's admissions policies treat new residents differently from longtime residents. *See Nat'l Ass'n for Advancement of Multijurisdiction Practice v. Berch*, 973 F. Supp. 2d 1082, 1110 (D. Ariz. 2013) (rejecting a plaintiff's challenge to Arizona's reciprocal Bar admissions policy because the rule "treats Plaintiffs like residents of Arizona who seek admission on motion"); *Paciulan v. George*, 229 F.3d 1226, 1229 (9th Cir. 2000) (rejecting a Fourteenth Amendment claim under the Privileges and Immunities Clause challenging California's *pro hac vice* Bar admission practices). Manley's amended complaint fails to state a plausible claim for a violation of the Fourteenth Amendment's Privileges and Immunities Clause.

Manley's claims under the Privileges and Immunities Clauses are dismissed with prejudice, because further amendment would be futile.

### 6.     The Full Faith and Credit Claim

Manley alleges that Thurgood Marshall "fails to give full faith and credit to transfer credit or accept credit from duly state sanctioned Non-ABA universities." (Docket Entry No. 21, at 8). He alleges that he "successfully obtained Non-ABA legal course work from California's Non-ABA accredited colleges whose content and context of legal course work has been sanctioned by the State of California court system." (Docket Entry No. 21, at 21).

The Full Faith and Credit Clause of the United States Constitution and its implementing statute, 28 U.S.C. § 1738, govern the preclusive effect of a state-court judgment in a subsequent federal action.[5] Final judgments of state courts "have the same full faith and credit in every court

---

[5] The Full Faith and Credit Clause states:

Full Faith and Credit shall be given in each State to the public Acts,

23

within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken." *Id.*  Under the Full Faith and Credit Clause, "[a] final judgment in one State, if rendered by a court with adjudicatory authority over the subject matter and persons governed by the judgment, qualifies for recognition throughout the land.  For claim and issue preclusion (res judicata) purposes, in other words, the judgment of the rendering State gains nationwide force." *Baker v. General Motors Corp.*, 522 U.S. 222, 233 (1998) (footnote and citations omitted).

Manley cites the Full Faith and Credit Clause in his amended complaint, but he does not explain how it applies.  Nor does he allege any facts that, if proven, would support an inference that the defendants violated the Clause or its implementing statute.  This claim is dismissed with prejudice, because further amendment would be futile.

### 7.    The Interstate Commerce Clause Claim

Manley alleges that by denying him admission, the Thurgood Marshall School of Law has forced him to leave Texas to "obtain a Non-ABA legal education," in violation of the Commerce Clause.  (Docket Entry No. 21, at 4).  He alleges that Thurgood Marshall's policies have "forced [him] to travel, and/or use the internet, as well as commute and/or use the internet[,] in order to

---

> Records, and judicial Proceedings of every other State.  And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.

U.S. CONST. art IV, § 1.

> Title 28 U.S.C. § 1738 states in relevant part:

> > The records and judicial proceedings of any court of any . . . State, Territory or Possession . . . shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have now by law or usage in the courts of such State, Territory or Possession from which they are taken.

24

receive a legal education from out of state schools." (Docket Entry No. 21, at 15). He also alleges that Thurgood Marshall's refusal to accept his transfer credits from a non-ABA accredited legal program in California violates the Commerce Clause. (Docket Entry No. 21, at 4).

The Commerce Clause states that "Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States." U.S. CONST., ART. I, § 8, cl. 3. "Although the Constitution does not in terms limit the power of States to regulate commerce, [the Supreme Court has] long interpreted the Commerce Clause as an implicit restraint on state authority, even in the absence of a conflicting federal statute." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007) (citing cases). "To determine whether a law violates this so-called 'dormant' aspect of the Commerce Clause, [courts] first ask whether it discriminates on its face against interstate commerce." *Id.* "In this context, ''discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" *Id.* (quoting *Oregon Waste Systems, Inc. v. Department of Environmental Quality of Ore.*, 511 U.S. 93, 99 (1994)).

Manley's amended complaint fails to explain how Thurgood Marshall's admissions policy is designed to benefit in-state economic interests at the expense of out-of-state competitors. The law school's refusal to accept transfer credits from non-ABA accredited schools burdens Texas applicants like Manley just as much as it does out-of-state applicants. He does not allege facts that, if proven, support an inference that the law school violates the Commerce Clause in any way. This claim is dismissed with prejudice, because further amendment would be futile.

IV.     **Conclusion**

The defendants' motion to dismiss Manley's amended complaint is granted.  (Docket Entry No. 23).  The defendants' motion to withdraw and replace its response to Manley's motion to expedite, (Docket Entry No. 28), is granted.  Manley's amended complaint is dismissed with prejudice, because further amendment would be futile.[6]  An order of dismissal is separately entered.

SIGNED on May 12, 2015, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

_____

[6]  The remaining motions, (Docket Entry Nos. 25, 31), are denied as moot.